[No. D003580. Fourth Dist., Div. One. Nov. 25, 1985.]

STEVEN WESLEY PEERY, SR., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
MARIA LETICIA PEERY, Real Party in Interest.

**COUNSEL**

Marcia Guy Orenstein for Petitioner.

No appearance for Respondent.

Daubney & Banche and William Henry Daubney for Real Party in Interest.

**OPINION**

**LEWIS, J.**—Petitioner Steven Wesley Peery, Sr., father of the minor child Steven, Jr., born November 13, 1979, whose custody is in issue, seeks a peremptory writ of mandate to compel the trial court to relinquish jurisdiction, to enforce a Louisiana custody decree, and to order the immediate return of the minor child to his father.

The trial court assumed jurisdiction over the custody matter at the request of the mother, real party Maria Leticia Peery, based on its conclusion the Louisiana court did not have custodial jurisdiction in this matter because when it assumed jurisdiction, a San Diego Superior Court decree had already given custody to Maria, and the San Diego court was actively enforcing that decree and continued to have a jurisdictional basis for such enforcement. Accordingly, under Civil Code section 5163 and the analysis

of *Kumar* v. *Superior Court* (1982) 32 Cal.3d 689 [186 Cal.Rptr. 772, 652 P.2d 1003], the court found continuing modification jurisdiction to be in San Diego, not Louisiana.

We derive the facts in this matter from the parties' declarations before the superior court and, where appropriate, from the reported decision in this matter of the Louisiana Second Circuit Court of Appeal in *Peery* v. *Peery* (La.App. 1984) 453 So.2d 635. Where facts conflict, we indicate the conflict by an asterisk (*), but, in accordance with established principles of appellate review, give that version which supports the trial court's judgment except if such facts are not supported by substantial evidence.

Steven, Sr., and Maria were married in San Diego on August 27, 1977, and a few days later went to live in Shreveport, Louisiana. The child, Steven, Jr., was born in Louisiana on November 13, 1979. According to Maria, the Louisiana residence was interrupted when the parties returned to Spring Valley, California, for the period January 1, 1980, to March 1, 1981.* Maria returned from Louisiana to San Diego with the child on March 1, 1982, allegedly because Steven, Sr., beat her.*

Maria filed a dissolution action in San Diego on December 22, 1982, personally serving Steven, Sr., in California. The court entered a stipulated interlocutory judgment February 14, 1983, awarding Maria custody and child support and Steven, Sr., rights of visitation.

After entry of the interlocutory, Maria returned to Louisiana with Steven, Sr., for an attempted reconciliation on March 1, 1983, but that attempt failed and she returned here with the child in July 1983.

Steven, Sr., filed a dissolution and custody action in Louisiana on July 23, 1983. He did not comply with the Louisiana law, identical to its counterpart in California's Uniform Child Custody Jurisdiction Act (UCCJA), which required him to notify the Louisiana court that the child was elsewhere (San Diego) and that a custody-determining action had been filed elsewhere (the California divorce action). (The relevant statutes are La.R.S. 13:1708; Civ. Code, § 5158.) He had Maria served in the action. According to Maria, he then told her he had dropped the charges and was dismissing the action.* Relying on those statements, she took no action, and a default judgment was entered in the Louisiana court on September 19, 1983, awarding custody to Steven, Sr. Steven, Sr., then came to San Diego on September 24, 1983, armed with the Louisiana decree, but the local police would not enforce it in light of its conflicting provisions with the San Diego custody decree. They suggested he go to court. Instead, Steven, Sr., asked Maria to permit him to take the child out for ice cream and instead took the child back to Louisiana.

Maria noticed an order to show cause in the San Diego Superior Court on October 3, 1983. After a hearing on November 16, 1983, at which an attorney appeared for Steven, Sr., the superior court on November 22, 1983, ordered Steven, Sr., to return the child to the San Diego court. The court's formal judgment found that the parties had not reconciled and that California continued to have jurisdiction, and ordered Steven, Sr., to return the child. He neither appealed this order nor returned the child.

Maria went to Louisiana to obtain the child. She appeared in the action which Steven, Sr., had filed there, seeking final divorce and custody of Steven, Jr. In that action, Steven, Sr., had again not informed the court about the conflicting California custody proceeding. The Louisiana trial court ruled in favor of Maria, that the custody was res judicata in California; but the Louisiana appellate court partly reversed this decision in *Peery* v. *Peery, supra,* 453 So.2d 635. Although agreeing that the California court had validly adjudicated the parties' divorce, the *Peery* opinion held the custody decree in California was not valid because California lacked jurisdiction under the UCCJA. California, said the *Peery* court, was not the child's home state when the custody-determining action was filed, because Steven, Jr., had not been six months in California at that time. (The California divorce action was filed Dec. 22, 1982; according to the *Peery* opinion, Maria brought the child back to California July 5, 1982; Maria, however, in her declaration here, claims she had returned by Mar. 1, 1982, a fact accepted by the trial court.) The *Peery* court further said the child had previously resided all his life in Shreveport, which was the parties' "matrimonial domicile." The court did not mention the fact that when the California custody decree was actually entered, on February 14, 1983, Steven, Jr., had been in California more than six months, nor the fact that no challenge had ever been made to the UCCJA jurisdiction in the California proceeding.[1] The court concluded that California was not the home state and lacked significant connection with Steven, Jr., hence lacked UCCJA jurisdiction, rendering the February 14, 1983, decree of the San Diego court void and not entitled to enforcement insofar as it determined custody. The *Peery* court also said the Louisiana trial court had erred in finding that Steven, Sr., had "snatched" the child from San Diego, because he went there under color of the Louisiana custody decree. The court emphasized heavily the connection of Steven, Jr., with Louisiana, saying he had lived there all his life except for eight months from July 1982 to March 1983, and two and one-half months from July 9 to September 22, 1983. Accord-

---

[1] The record in the California dissolution action indicates filing of the standard declaration under Uniform Custody of Minors Act along with the petition for divorce, alleging the child was returned to California March 1, 1982. Since the petition was filed December 22, 1982, the pleadings on their face show the six-month jurisdictional home state basis required under the act.

ingly, the court found jurisdiction in Louisiana under its UCCJA and ordered the trial court to determine the custody.

Maria did not appeal the *Peery* v. *Peery* opinion. When the trial court on remand after *Peery* v. *Peery* heard the custody issue, Maria appeared and was represented. The trial court awarded custody as follows: legal custody joint to both parents; physical custody to Steven, Sr., Maria to have visitation on vacations and to pay child support. The court expressly found that both parental homes were fit homes and gave no reasons for its choice of Steven, Sr., as custodial parent. The final decision was rendered on January 31, 1985; Maria did not appeal that decision.

The instant proceeding arose while Steven, Jr., was here on visitation with Maria during the summer of 1985. Maria on July 30, 1985, applied to the San Diego Superior Court seeking an order to show cause in the divorce action as to why she should not have custody and retain the child. She has refused to return him as required by the Louisiana decree. The superior court, as stated, found it had jurisdiction to hear the custody matter, and Steven, Sr., by this petition for writ of mandate, seeks to overturn that finding.

In unraveling this tangle, we note that the California decree awarding Maria custody was entered first. If jurisdiction to make that decree existed, then under the UCCJA, the decree was entitled to continuing enforcement in the California court, so long as the court here did not relinquish jurisdiction and so long as the state continues to have significant connection with the child and at least one parent. (Civ. Code, § 5163; *Kumar* v. *Superior Court, supra,* 32 Cal.3d at pp. 699-700; *In re Marriage of Ratshin* (1983) 144 Cal.App.3d 974, 978 [192 Cal.Rptr. 891].) Normally, only when the child and both parents have left the decree-rendering state is deference to the jurisdiction of the original court no longer appropriate. (*Kumar* v. *Superior Court, supra,* 32 Cal.3d at p. 696; *In re Marriage of Ratshin, supra,* 144 Cal.App.3d at p. 980.) This analysis is compelled by the mandatory language of Civil Code section 5163, dealing with modification jurisdiction over an out-of-state custody decree, and specifically providing in subdivision (1): "If a court of another state has made a custody decree, a court of this state *shall not modify* that decree unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this title or has declined to assume jurisdiction to modify the decree . . . ." (Italics added.) Louisiana, a state in which the UCCJA is also in effect, is similarly bound by its enacted counterpart of this provision.

In order to ascertain whether Louisiana correctly assumed jurisdiction of this matter, it is necessary to inquire (1) whether the California decree had

a valid jurisdictional basis and (2) whether, at the time of the Louisiana proceeding, the connections with California had sufficiently eroded to undermine the modification jurisdiction of the San Diego court. ■ As to the first question, because the California matter proceeded on a consensual basis and resulted in a default judgment, there was never a hearing regarding the existence of jurisdictional facts under Civil Code section 5152 of the UCCJA. The Louisiana court in *Peery* v. *Peery* simply assumed there was no jurisdiction because in its view of the matter, Steven, Jr., had not been in California for six months at that time, hence, there was no home state jurisdictional basis under the uniform act. (See Civ. Code, § 5152, subd. (1)(a)(i).) However, according to Maria's declaration, which the court here believed, Steven, Jr., was in fact present in California more than six months before the action was filed. As stated *ante,* footnote 1, the declaration regarding custody said the child came to California March 1, 1982. (He was certainly there for more than six months before the decree determining custody was entered.[2] Since that consensual decree was based on an agreement of the parties as to custody which must have taken place at some point between the filing of the action and the entry of the decree, it is certain that at the time the child's custodial destiny was in fact "determined"—by the parties—the child had been in California for at least six months.) Another basis for jurisdiction under section 5152 is the significant connection with the rendering state of the child and at least one parent (Civ. Code, § 5152, subd. (1)(b)), and the *Peery* opinion states no facts negating the possible existence of that jurisdictional basis for the California decree. The opinion of the Louisiana appellate court finds it significant that Steven, Jr., spent all his life in Louisiana except for the stated periods of eight months and two and one-half months, respectively. However, the force of that observation diminishes when one considers that under the facts Maria has alleged, Steven, Jr., in fact spent some twenty-eight and one-half months in California, a period which, if not "all" his life, is a significant part of his five years.[3] ■ Thus, we do not see a legally adequate basis for a collateral attack on the California decree for lack of jurisdiction, keeping in mind that Steven, Sr., had knowledge of that proceeding and never contested the jurisdiction of the court then.

---

[2]The cases conflict regarding whether the filing date or the date of determination of custody controls for purposes of deciding whether there is a home state basis for jurisdiction under the UCCJA. (See *Plas* v. *Superior Court* (1984) 155 Cal.App.3d 1008, 1015, fn. 5 [202 Cal.Rptr. 490]; cf. *In re Marriage of Hopson* (1980) 110 Cal.App.3d 884, 894 [168 Cal.Rptr. 345]; and the out-of-state cases cited in *Plas* v. *Superior Court, supra,* at p. 1015.) We need not determine this issue since here the pleadings and declaration of Maria establish a basis for home state jurisdiction at the date of filing the petition.

[3]The 28½ months is calculated thus: Spring Valley sojourn, January 1, 1980, to March 1, 1981, 14 months; return to San Diego until attempted reconciliation, March 1, 1982 to March 1, 1983, 12 months; end of reconciliation until return of child to Louisiana, July 9, 1983, to September 24, 1983, 2½ months; total, 28½ months.

The father here argues that when the first (default) judgment regarding divorce and custody was entered in California, although he was personally served in that matter and consented to that judgment, nevertheless the judgment remained subject to later collateral attack for lack of subject matter jurisdiction, which attack, he further claims, he successfully brought in the Louisiana action, *Peery* v. *Peery*. He further says the finding of the Louisiana court that there was no subject matter jurisdiction in California on the custody issue is now res judicata on that point. In support of his argument that he may collaterally attack the California judgment he cites the case of *In re Marriage of Ben-Yehoshua* (1979) 91 Cal.App.3d 259, 263 [154 Cal.Rptr. 80], stating, for purposes of custodial jurisdiction under the UCCJA, that "subject matter jurisdiction cannot be conferred upon a court by consent, waiver or estoppel." In support of the latter proposition, the *Ben-Yehoshua* court cites a number of cases and secondary authorities, including, inter alia, 1 Witkin, California Procedure (2d ed. 1970) Jurisdiction, section 10, pages 534-536.

Since 1970, Witkin has produced a new edition of the California Procedure series, and in discussing the point cited in *Ben-Yehoshua* he notes in extensive discussion that the general proposition of the vulnerability to collateral attack of a judgment for lack of subject matter jurisdiction—like most general statements—is not so generally applicable as at first glance appears. In fact, in cases where, as here, the party who wants to attack the judgment had notice and the opportunity to be heard and either participated in the proceeding or consented to the judgment, the general rule is exactly opposite: such party normally is bound by the judgment, and estopped from attacking it collaterally, unless certain exceptional circumstances exist. (2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, § 280, pp. 686-687.) The rule he states, adopted by both the Restatement Second of Judgments section 12, and the Restatement Second of Conflict of Laws section 97, is that normal principles of res judicata apply to the determination of subject matter jurisdiction unless that policy is outweighed by the policy against allowing a court to act without jurisdiction. (*Id.*, at p. 687.) The exceptions most commonly invoked to permit collateral attack are where the exercise of jurisdiction constitutes a manifest abuse of authority; the judgment substantially infringes on the authority of another tribunal or governmental agency; the court lacks the capability to adequately determine its jurisdiction, and procedural fairness requires that it be subject to collateral attack (Rest. 2d Judgments, § 12.) Another compilation of exceptions says the judgment may be collaterally attacked where the lack of jurisdiction is clear; the jurisdictional issue is one of law rather than fact; the court is of limited jurisdiction; the jurisdictional issue is not actually litigated; or there is a strong policy against acting beyond jurisdiction. (Rest. 2d Conflicts of Law, § 97.)

The leading United States Supreme Court case on the subject holds a most basic facet of subject matter jurisdiction, unconstitutionality of the underlying statute authorizing the procedure, is "cured" by application of res judicata even where the issue was not actually litigated in the proceeding. (*Chicot County Drainage Dist.* v. *Baxter State Bank* (1940) 308 U.S. 371 [84 L.Ed. 329, 60 S.Ct. 317], cited in 2 Witkin, *supra,* at p. 691.) ▮ ▮ ▮ ▮ ▮ As pointed out in a California case[4] following the *Chicot* case, the issue of subject matter jurisdiction is impliedly determined in every proceeding, in that the court rendering a decree must pass on and determine its own jurisdiction to do so.

▮ Looking now at the consent divorce decree here, none of the normal exceptions apply which would justify permitting a party to the judgment to attack it collaterally. Clearly, the determination of a custody issue in a superior court empowered to decide such matters generally is not a manifest abuse of authority. The judgment, when entered, did not substantially infringe on the jurisdiction of any other tribunal, because the parties had not filed proceedings in any other tribunal then. The superior court, as stated, did not lack the capability to adequately determine its jurisdiction over a custody matter. The jurisdictional issue, existence of the seminal facts under the UCCJA, is clearly factual, not legal. We know of no strong policy against acting beyond jurisdiction in such a situation (since the aid of no other tribunal had then been sought such as might conflict with the decision of the California court). Finally, although the jurisdictional issue was not "litigated" in the sense that arguments were made and evidence presented, it was "litigated" in the same way that all the issues underlying a default or consent judgment are litigated, by the presentation of the issue to the court and its necessary implied determination that it has jurisdiction to act. ▮ As has been noted in a discussion of subject matter jurisdiction to determine custody in divorce proceedings generally (as opposed to matters involving the UCCJA), the simple allegation that the parties seek a divorce and that there are minor children of the marriage confers subject matter jurisdiction upon the court to determine custody, a jurisdiction which does not vanish even if later it is shown there are no such children. (See discus-

---

[4](*Bank of America* v. *Department of Mental Hygiene* (1966) 246 Cal.App.2d 578, 585 [54 Cal.Rptr. 899], cited in 2 Witkin, Jurisdiction, *supra,* at p. 691; and see law review articles there cited, 65 Harv.L.Rev. 853; 2 UCLA L.Rev. 457; 52 Cal.L.Rev. 623; see also the case of *Sherrer* v. *Sherrer* (1948) 334 U.S. 343 [92 L.Ed. 1429, 68 S.Ct. 1087], establishing the res judicata effect of a finding of domicile as a jurisdictional requisite in a divorce proceeding, saying: "the requirements of full faith and credit bar a defendant from collaterally attacking a divorce decree on jurisdictional grounds in the courts of a sister State where there has been participation by the defendant in the divorce proceedings, where the defendant has been accorded full opportunity to contest the jurisdictional issues, and where the decree is not susceptible to such collateral attack in the courts of the State which rendered the decree." (*Id.,* at pp. 351-352 [92 L.Ed. at p. 1436], quoted in 2 Witkin, *supra,* Jurisdiction, § 285, p. 692.))

sion in *In re Marriage of Halpern* (1982) 133 Cal.App.3d 297, 309 et seq. [184 Cal.Rptr. 740].) The fact that there are no minor children, in such a case, would merely require that the court decide the custody issue a certain way, namely, by declining to make an order respecting any children, but would not change the essential jurisdictional fact of the superior court's power to adjudicate the custody of minor children in a divorce proceeding. (See also the case of *Perry* v. *Superior Court* (1980) 108 Cal.App.3d 480 [166 Cal.Rptr. 583], discussed in *Halpern, supra.*) ■ Similarly, here, the divorce court which rendered the judgment as to custody had subject matter jurisdiction over that issue under the terms of the consent judgment as presented to the court.

■ In general, then, the parties to a consent judgment entered in accordance with fair procedures are not entitled later to reopen the matter in a different tribunal attacking the subject matter basis for the judgment. ■ The only case we are aware of which considers this general proposition with specific reference to subject matter jurisdiction under the UCCJA is the *Ben-Yehoshua* case. There a collateral attack upon subject matter jurisdiction under the UCCJA was permitted, based, as stated, upon the court's reliance, without discussion or analysis, on the proposition that subject matter jurisdiction cannot be conferred by consent, a proposition which, as we have shown, is not necessarily universally applicable. In *Ben-Yehoshua,* however, conceded facts actually developed in the record of the first proceeding clearly showed lack of subject matter jurisdiction under UCCJA principles. There, after a 13-year marital domicile in Israel, the wife came to California and a mere 14 days after her arrival in Kings County filed for separation, requesting custody. The husband came to California, litigated the matter briefly, then stole the children and returned to Israel where he secured a favorable custody determination. The California Court of Appeal found an initial lack of subject matter jurisdiction in the Kings County Superior Court, which defect was not cured because the husband had participated in the California proceeding. As the court said, "Because the children were only in California for approximately two weeks before the filing of the separation and custody petition and spent a total of approximately one month here, it is manifest that the preferred home state jurisdictional prerequisite was not satisfied." (*In re Marriage of Ben-Yehoshua, supra,* 91 Cal.App.3d at p. 265.) The court found it similarly apparent, based on the parties' long residence in Israel, that the "significant relationship" basis of UCCJA jurisdiction was not present either. Accordingly, the Kings County judgment was found entirely void, i.e., subject to collateral attack by the filing of another proceeding in Israel.

The case here is entirely different. Not only is there no "manifest" lack of jurisdiction basis for the California judgment, but the record shows the

standard declaration under Uniform Custody of Minors Act was filed, stating the child was returned to California March 1, 1982, more than six months before the filing of the petition on December 22, 1982, providing a "home state" basis for the custodial determination. Nor do we have here a situation, as in *Ben-Yehoshua*, where the children had already lived in the foreign jurisdiction for many years. (There, the oldest child had been born in Israel in 1964, and when the California petition was filed in 1975, had therefore lived in Israel for some 11 years.) Accordingly, an accepted basis to permit collateral attack—that the lack of jurisdiction is clear or manifest—was present in *Ben-Yehoshua*, but is not present here.

We note too that in *Ben-Yehoshua* the father participated only briefly in the California procedure; he made an appearance at the order to show cause hearing, paid costs, and agreed to have the matter submitted to the probation department for investigation; but in late July or early August 1975, about three weeks after the filing of the petition on July 9, he took the children back to Israel. Here, in contrast, not only did the father consent to the entry of an interlocutory decree determining custody, on February 14, 1983, but he did not file the Louisiana proceeding until July 23, 1983, after the failure of reconciliation attempts. Clearly, the father here, unlike the situation in *Ben-Yehoshua*, fully submitted the case to the California court *ab initio*, deferred to its jurisdiction, and only much later, dissatisfied with the turn of events, chose to invoke the aid of another forum. These facts present a classic case of forum shopping such as the UCCJA was intended to avoid.

Under the circumstances presented here, it does not serve the purposes of the UCCJA to permit a collateral attack upon the subject matter jurisdiction of the first tribunal to have determined custody, nor would such an attack be consonant with the principles we have discussed generally preventing the parties to a judgment from later attacks upon the tribunal's jurisdiction, unless certain exceptional circumstances be present. We do not perceive this determination to be inconsistent with the decision in *Ben-Yehoshua, supra,* 91 Cal.App.3d 259.

The pleadings and judgment in the California proceeding in 1982-1983 conclusively establish UCCJA subject matter jurisdiction over the custody of the child as to the father and mother who participated in the proceeding and consented to the judgment and the Louisiana court had no power to permit a collateral attack on that judgment.

■ As to the continuation of modification jurisdiction, clearly there was no relinquishment; as of December 1983, the San Diego court was actively exercising jurisdiction, ordering production of the child here. Further, there has not been loss of contact with the then custodial parent, Maria,

who has remained here since July 1983. What is more, when the Louisiana decree was entered in September 1983, there had been complete failure to observe the mandate of the UCCJA, enacted in both states, that the court must be informed of the child's whereabouts and the pendency of an earlier action. Additionally, if Maria's allegations are true, there may have existed extrinsic fraud in the entry of that decree sufficient to make it voidable upon her collateral attack. Clearly, the decree then entered was not the result of a noticed, contested custody proceeding.

What is more, the opinion of the Court of Appeal of Louisiana in *Peery* v. *Peery* does not explain why the failure to observe UCCJA requirements has not undermined the Louisiana action nor does it rest its conclusion of no California jurisdiction on any significant jurisdictional fact other than the date of filing of the California divorce action less than six months after Steven, Jr., had allegedly been returned to San Diego. That date is not necessarily significant; commencement of the custody determining procedure is what matters (Civ. Code, § 5152, subd. (1)(a)); and as we have stated, by the time a custody determining decision here was either made (by agreement) or entered (by entry of the interlocutory), there was a valid jurisdictional basis under either the "home state" or "significant connections" provisions of the UCCJA.

Additional reasons to be wary of the Louisiana proceedings are first, the trial court states no reasons for placing the custody with Steven, Sr. Further, the Louisiana appellate court does not correctly view the manner of the child's removal to Louisiana. Regardless of whether Steven, Sr., had a "decree" in his hand, a ruse is still a ruse; he removed the child by trickery, instead of resorting to the courts, as the police suggested, for reconciliation of the conflicting court orders possessed by both parents. To encourage or condone such methods is to undermine the UCCJA's purposes. (E.g., *In re Marriage of Hopson, supra,* 110 Cal.App.3d at p. 895.) Nor did the Louisiana opinion in *Peery* v. *Peery* focus on the question of modification jurisdiction as we are required to do under the doctrine of *Kumar* v. *Superior Court, supra,* 32 Cal.3d 689. In that opinion our Supreme Court has stressed the overwhelming importance of deference to the state of original custody decree unless there is clear loss of contact, to prevent continual custodial conflict, shifting of children, abductions, and other unwise acts committed in the hope of finding more favorable forums. ▮▮▮ The opinion in *Kumar* says:

"The Uniform Act, adopted in 44 states by 1981, was promulgated for the stated purposes of avoiding jurisdictional competition and conflict, promoting interstate cooperation, litigating custody where child and family have closest connections, discouraging continuing conflict over custody, de-

terring abductions and unilateral removals of children, avoiding relitigation of another state's custody decisions, and promoting exchange of information and other mutual assistance between courts of sister states. (Uniform Act, § 1; § 5150.)

"... . . . . . . . . . . . . . . . . . . . . . . .

"While the courts have given lip service to the policies provided by the Uniform Act, some have been reluctant to forego what they see as concurrent jurisdiction to proceed under the act. In no area has the confusion been greater than in the modification of out-of-state custody decrees.

"Consistent with its goal of avoiding 'relitigation of custody decisions of other states in this state insofar as feasible' (§ 1, subd. (6); § 5150, subd., (f)), the Uniform Act commands in section 13 (§ 5162) that the courts of this state shall recognize and enforce 'an initial or modification decree' of a court of another state which had assumed jurisdiction under the terms of the act. The next section, section 14 of the Uniform Act (§ 5163), governs the authority of California to modify an out-of-state decree. Section 5163 provides: '(1) If a court of another state has made a custody decree, a court of this state *shall not modify that decree* unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this title or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction.' (Italics added.)

"Professor Bodenheimer, reporter for the special committee which drafted the Uniform Act, interpreted the section's language—'this state shall not modify'—as meaning precisely what it says: 'In other words, the continuing jurisdiction of the prior court is exclusive. Other states do not have jurisdiction to modify the decree. They must respect and defer to the prior state's continuing jurisdiction. Section 14 is the key provision which carries out the Act's two objectives of (1) preventing the harm done to children by shifting them from state to state to relitigate custody, and (2) preventing jurisdictional conflict between the states after a custody decree has been rendered. . . . [¶] Exclusive continuing jurisdiction is not affected by the child's residence in another state for six months or more. Although the new state becomes the child's home state, significant connection jurisdiction continues in the state of the prior decree where the court record and other evidence exists and where one parent or another contestant continues to reside. *Only when the child and all parties have moved away is deference to another state's continuing jurisdiction no longer required.*' (Italics added; Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Juris-*

*diction Under the UCCJA* (1981) 14 Fam.L.Q. 203, 214-215.)" (*Kumar* v. *Superior Court, supra*, 32 Cal.3d at pp. 695-696, fns. omitted.)

■ As we have pointed out, in this matter, it would have been appropriate for Louisiana to defer to California, because the child and all parties had not moved away, the San Diego court had not relinquished jurisdiction, and all the interests of the UCCJA would have been best served by leaving modification to the San Diego court.

We conclude that the Louisiana court lacked jurisdiction to redetermine custody under the UCCJA because of the pendency of a custody proceeding here. The Louisiana decree is therefore not entitled to full faith and credit under Civil Code section 5162 because it was not rendered "under factual circumstances meeting the jurisdictional standards of the title" nor did the rendering court have UCCJA jurisdiction, under section 5163. Maria's failure to appeal the Louisiana decision is therefore immaterial. California has had jurisdiction from the start, and, as the trial court ruled, continues to have it. ■ Such a result is "in accord with the letter of section 5163 and its purpose 'to achieve greater stability of custody arrangements and avoid forum shopping.'" (*Kumar* v. *Superior Court, supra*, 32 Cal.3d at p. 698; *Palm* v. *Superior Court* (1979) 97 Cal.App.3d 456, 468 [158 Cal.Rptr. 786].) ■ Any other result would encourage disruptive conduct such as here occurred consisting of the removal of the child by trickery and improper resort to a second forum without full disclosure of the jurisdictional facts, and would also penalize the victim of that conduct here, Maria, because in a good faith effort to regain custody of her child she did participate up to a point in the Louisiana proceedings.

The alternative writ is discharged, and the petition for a peremptory writ of mandate is denied.

Kremer, P. J., and Work, J., concurred.